BLACK v. TOWN OF SPRINGFIELD
(60 S. E. (2d) 854)

*Mr. T. B. Bryant, Jr.,* of Orangeburg, *for Appellant,*

*Messrs. Brown & Jefferies,* of Barnwell, *for Respondent,*

August 4, 1950.

Taylor, Justice.

This appeal comes to this Court from an order of the Court of Common Pleas for Orangeburg County affirming an award by the South Carolina Industrial Commission to

the respondent for death benefits under the Workmen's Compensation Act. Code 1942, § 7035-1 et seq.

Respondent's husband, Furman Black, was employed by the Town of Springfield, South Carolina, as Chief of Police for some time prior to his death on January 8, 1948. While riding on the side of a fire truck, owned by the Town, on its way to extinguish a grass fire, he fell and received injuries from which he shortly died.

The Hearing Commissioner, after several hearings, rendered an award in favor of the claimant, which was affirmed by the majority of the Commission. Thereafter, an appeal was taken to the Circuit Court, where the Honorable M. M. Mann, the Presiding Judge, passed an order, dated November 11, 1949, affirming the opinion and award of the Full Commission.

Appellant now comes to this Court contending first that the South Carolina Industrial Commission lacked jurisdiction for the reason that it does not appear that the said Town employed as many as fifteen people.

The record discloses that the Town of Springfield had at the time in question fewer than fifteen employees. This question was not presented either before the Commission or upon appeal to the Circuit Court, but is presented here to this Court for the first time. The jurisdiction of a Court of the subject matter of an action depends upon the authority granted to it by the Constitution and laws of the State and is fundamental. Objection to such jurisdiction may be made at any time during the progress of the action and cannot be waived or conferred by consent. We are therefore of the opinion that the question of jurisdiction is properly before this Court even though it was raised here for the first time. *Senn v. Spartanburg County,* 192 S. C. 489, 7 S. E. (2d) 454; *Ladshaw v. Hoskins,* 204 S. C. 346, 29 S. E. (2d) 480; *Rosamond v. Lucas-Kidd Motor Co.,* 182 S. C. 331, 189 S. E. 641; *American Agricul-*

*ture Chemical Co. v. Thomas,* 206 S. C. 355, 34 S. E. (2d) 592, 160 A. L. R. 594.

Section 7035-2, Subsection (a) of the Code of Laws for South Carolina provides: "The term 'employment' includes employment by the State and all political subdivisions thereof, and all public and quasi-public corporations therein and all private employments in which fifteen or more employees are regularly employed in the same business or establishment except agriculture and domestic service."

Section 7035-8 provides: "Neither the State nor any municipal corporation within the State, nor any political subdivision thereof, nor any employee of the State or of any such corporation or subdivision, shall have the right to reject the provisions of this article relative to payment and acceptance of compensation, and the provisions of sections 7035-5, 7035-6, 7035-17, 7035-18 and 7035-19 shall not apply to them. Any employee of the State or any political subdivision, or any department thereof, or of any county or any municipal corporation shall be entitled to bring suit against his said employer for the recovery of the benefits to which he may be entitled, under the terms and provisions of this article; and consent to such suit or suits is hereby expressly given."

Considering these two sections in conjunction, the one with the other, it is apparent that the legislature intended to set up two classes of employers: (1) the State and all political subdivisions thereof, including quasi-public corporations; (2) all private employment in which fifteen or more regular employees are employed. In the latter class employers and employees are given the express right to elect whether or not they shall come under the provisions of the Workmen's Compensation Act, but no such right is given those falling within the first group. It is contended that the "quasi- public corporations" do not fall within that group designated as "the State and all political subdivisions there-

of." With this we cannot agree. Had a comma been placed after the words "quasi-public corporations", there would be no question of what the legislature meant thereby. However, construing this section in conjunction with section 7035-8 of the act, we are of the opinion that the legislature intended that municipal corporations and their employees are subject to and bound by the terms of the Workmen's Compensation Act regardless of the number of employees employed by the municipality.

This question was touched upon but not decided in the case of *Brown et al. v. Town of Patrick*, 202 S. C. 236, 24 S. E. (2d) 365. However, the identical question was before the North Carolina Supreme Court in the case of *Rape v. Town of Huntersville*, 214 N. C. 505, 199 S. E. 736, and that Court arrived at the same conclusion expressed here.

It is also contended that there is no evidence to support the finding of the Industrial Commission that the deceased, Furman Black, died as a result of injuries which arose out of and in the course of his employment. This necessitates reviewing the testimony and in doing so, this Court is of course cognizant of the well-founded rule of law that the Industrial Commission being the fact-finding body and this Court and the Circuit Court both being appellate Courts in Workmen's Compensation matters, this and the Circuit Courts can only review the facts to determine whether or not there is any competent evidence to support the findings of the fact-finding body. If there is, the Courts are without power to pass upon the force and effect of such evidence. An award may of course be reversed if there is an absence of any competent evidence to support it, but in Workmen's Compensation cases the Courts are not the triers of facts. If the facts proved are capable as a matter of law of sustaining the inference of fact drawn from them by the Industrial Commission, its findings are conclusive in the absence of fraud and neither this Court nor the Court of Common Pleas is at liberty to interfere with them.

*Schrader v. Monarch Mills,* 215 S. C. 357, 55 S. E. (2d) 285; *Hewitt v. Cheraw Cotton Mills,* S. C., 59 S. E. (2d) 712.

Respondent quotes in her brief the following testimony to support her contention that the deceased received injuries which arose out of and in the course of his employment from which he died:

"Mr. Bennett:

"Q. Was it one of the jobs of a police officer to direct traffic at fires? A. Sure.

"Q. Was it one of the duties to see that nobody got hurt? A. Yes, sir.

"Attention is also invited to the testimony of Mr. Jim Jumper.

"Q. What were the duties in regard to fires? A. Turn the alarm on, assist in taking care of the hose at a fire. That has been a habit.

"Q. I am asking if you ever assisted the policemen in the Town of Springfield fight fires? A. I have assisted the fire department. I couldn't say that I assisted the police.

"Q. You have assisted yourself? A. I have.

"Mr. J. E. Cannon, the night policeman, testified as follows:

"Q. Mr. Cannon, have you ever fought a fire while you were a member of the Police force? A. Yes, sir, I helped with one fire, sent in the alarm, opened the doors of the fire house, sent in the alarm and assisted Mr. Jumper with the reel in the truck. I helped connect the hose right close to the fire house and I was standing there and watched those men and got wringing wet.

"Q. State whether you helped hold the hose? A. I helped connect it up and turned it over to the boys and came out.

\* \* \*

"Q. State whether or not you said you fought fire? A. I did. And when the boys came I handed it over to them and went against them just like Mr. Black did."

Referring more fully to the testimony of witnesses Bennett and Cannon, mentioned above, we find that Mr. Leonard Bennett, Mayor of the Town of Springfield until January 5, 1948, testified that four or five months before he went out of office a new fire truck was purchased, and we herewith reproduce a portion of his testimony:

"Q. Mr. Bennett, did you as Mayor of the Town of Springfield give any orders to the policemen in the Town of Springfield with reference to the fire truck when it was bought? A. I did.

"Q. Did you give an order to Mr. Furman Black? A. I did.

"Q. Tell the Commissioner what your instructions were? A. When they delivered the truck to the Town of Springfield they sent a man to show how to operate it and I was coming from the house one night and the truck going down the street with the fire fighters on it to practice and Mr. Black was on it and the thing popped in my mind, I said: 'My God, there is old man Black riding on the fire truck.' I called him off and said: 'Mr. Black, you should not ride on that fire truck.' He was a large man weighing about two hundred pounds and even for a young man it is dangerous. And at Council meeting I told them.

"Q. Had the truck been delivered and installed? A. No, sir, they brought it and we were to accept it after they learned to operate it.

"Q. When you saw Mr. Black that night you went to him and told him immediately? A. I followed the truck to tell him.

"Q. What were your reasons for that? A. He was a very large man and more or less clumsy.

"Q. What was his age? A. He wasn't very old, probably fifty-five, but very large and it was dangerous for him to be hanging on the fire truck. At the following Council meeting I told Mr. Black and Mr. Cannon, the other police officer, to stay off the truck; that it wasn't their duty to ride the truck or have anything to do with it."

Mr. J. E. Cannon, the night policeman for the Town, testified as follows:

"Q. Did you have any specific instructions from the officials of the Town Council with reference to riding the fire truck or having anything to do with it? A. Yes, sir, they told me not to ride it.

"Q. Who told you? A. Mr. Bennett, the Mayor of Springfield, and also Dr. Busby when he came in office.

"Q. Did Mr. Bennett till you while the two of you were together at Town Council right after they got the truck to stay off it? A. Yes, sir. I heard him tell both of us."

A few days prior to the death of Mr. Black, Dr. Lucius Busby assumed the office of mayor and a portion of his testimony appears as follows:

"Q. Dr. Busby, would you tell us whether or not it is the duty of a police officer in the Town of Springfield to assist in fire fighting or operate the fire truck or go to others on the truck? A. Mr. Bryant, I will have to answer this way. We made every effort possible to segregate the police from the fire department. The first night of council I instructed all the fire department and police department that one did not carry the duties of the other.

"Q. Doctor, do you recall the day of the accident when Mr. Furman Black was injured? A. Yes, sir.

"Q. Do you recall him speaking to you about a grass fire or a trash fire and about the truck? A. Yes, sir.

"Q. Will you tell the Commissioner what you told him and what he told you? A. I was standing on the street by the police house and Mr. Black approached me very erect and looked like a million dollars and asked if he could go and turn the siren on and take the truck out and I told him 'No, sir.' I was already mad about the whole thing anyway and I told him that he did not have any duties with the fire department and told him he could not do anything about carrying the truck out and I wanted it specificially understood that none of the police had anything to do with the truck,

and in less than five minutes he had done exactly what we told him not to do.

* * *

"Q. Within five minutes' time he did just what you told him not to do, getting on that truck? A. Yes, sir.

"Q. Did you see the truck? A. Yes, sir. I did not see who was driving it.

"Q. You saw Mr. Black on it? A. Yes, sir.

"Q. Did you notice him above everything else? Why did you notice him? A. I was standing right beside the truck and it passed by me.

"Q. You had just told him not to get on? A. Yes, sir, about five minutes before.

* * *

"Q. Dr. Busby, will you tell me what this book contains? A. Minutes of the meetings we had at regular times.

"Q. State whether or not this page shows the minutes of the meetings held on January 6th? A. Yes, that was the meeting of January 6th.

"Q. These are the minutes of the meeting on January 6th? A. Yes, sir. We had very much discussion of the fire department and what to do and not.

"Mr. Bryant: I want to offer that in evidence. Mr. Jefferies: I think we are going to get the gist of what the Town Council did on that occasion from the Mayor and I object to putting it in evidence.

"Mr. Bryant: We think the written minutes are the best evidence we can have in court. The Court: I think you are right, Mr. Bryant, that is the best evidence.

"Mr. Bryant: Your Honor, we offer the Minute Book in evidence and I wish to read in the record the minutes of the Town Council Meeting on January 6, 1948, with Mayor Busby presiding, Councilmen Zeigler, Gleaton, Bennett and Jumper present. 'Proceeded with regular business and elected Mrs. Melba S. Miller Clerk and Treasurer at the same salary. Planning Board was re-elected as organized. It was decided to elect eight boys (or more) as members of the

Fire Commission and to have the Chief of the Fire Department try the truck out once a week and make a report to the Clerk. Only firemen to ride the truck.' That is the relevant portions of the Minutes."

Mr. Bobby Jumper, a member of the Council, testified that he was a fireman and that Mr. Black fell from the truck while he was driving and that he was not aware that Mr. Black was holding on to the side of the cab.

The record is replete with testimony that Mr. Black was acting completely without the course of his employment and against the explicit instructions of the Mayor and Town Council of the Town of Springfield. We are therefore constrained to hold that the facts proved are not capable, as a matter of law, of sustaining the inferences of fact drawn from them by the Industrial Commission. The lack of substantial conflict in the testimony renders the question of whether deceased's injuries arose out of his employment, which is ordinarily one of fact for the Industrial Commission, a question of law to be determined by the Court. The testimony, in our opinion, not only fails to show that deceased's injuries were sustained while performing duties within the scope of his employment but positively shows that such injury was brought about through his own acts which were not only wholly without the scope of his employment but had been expressly forbidden by his employers.

For the foregoing reasons, we are of the opinion that the award of the Industrial Commission and the order of the Circuit Court, sustaining such award, should be reversed, and it is So Ordered.

FISHBURNE, STUKES and OXNER, JJ., and E. H. HENDERSON, A. A. J., concur.

BAKER, C. J., not participating.